## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA,**

**v.**                                                    **Case No. 8:17-cv-1874-MSS-AEP**
                                                                  **8:14-cr-62-MSS-AEP**

**STEPHANIE DASINGER**

_____/

## O R D E R

This cause comes before the Court for consideration of Petitioner Stephanie Dasinger's timely filed motion to vacate, set aside, or correct her sentence, pursuant to 28 U.S.C. § 2255. (Civ. Docs. 1, 2)[1] Upon consideration of the motion and in accordance with the *Rules Governing Section 2255 Cases in the United States District Courts*, the Court **ORDERS** that the motion to vacate is **GRANTED IN PART and DENIED IN PART**.

## I.    STATEMENT OF THE CASE AND FACTS

### A.    Dasinger's Criminal Case

On October 9, 2013, law enforcement searched a Days Inn hotel room, resulting in Dasinger's arrest. Dasinger was indicted on February 20, 2014, along with co-defendant Jefferson Patterson. (Doc. 1) The indictment brought four charges against Dasinger: (i) conspiracy to possess with intent to distribute 50 grams or more

---

[1] References to filings in criminal case number 8:14-cr-62-T-35AEP are cited as "Doc. [document number]." References to filings in this civil case are cited as "Civ. Doc. [document number]."

of methamphetamine; (ii) possession with intent to distribute 50 grams or more of methamphetamine; (iii) possession of a firearm in furtherance of a drug trafficking crime; and (iv) possession of a firearm by a convicted felon. (*Id.*) After counsel was appointed, the Government offered Dasinger a plea deal of 10 years' imprisonment in exchange for testifying against her co-defendant. (Doc. 121 at 4:17–5:2; Civ. Doc. 2 at 2) Dasinger rejected the offer. At this time, the Government had not yet enhanced Dasinger to a mandatory life sentence under 21 U.S.C. §§ 841(b)(1)(A) and 851 (2013). (Doc. 121 at 5:23–6:11; Civ. Doc. 2 at 2) On July 3, 2014, the Government filed a notice that Dasinger was subject to enhanced, mandatory penalties under 21 U.S.C. §§ 841(b) and 851 based on four prior state court convictions for possession of small quantities of methamphetamine. (Doc. 35)

On July 15, 2014, after the Government filed the notice of the enhancement, Dasinger moved to suppress the methamphetamine and the loaded firearm found in the trunk of a car parked outside the Days Inn hotel room where she was staying. (Doc. 37) She also sought suppression of her post-arrest statements. (*Id.*) On July 28, 2014, the Government responded to Dasinger's motion, principally contending that the search of the hotel room — which precipitated the search of the vehicle — was constitutional because a co-tenant of the room, James Lloyd, consented to the search. (Doc. 40) On August 4, 2014, the Court held an evidentiary hearing on the motion. (Doc. 47)

At the hearing, the Court heard testimony by law enforcement officers Bobby Hartzig and Luis Rios, Special Agent Daniel McCaffrey, and the hotel manager,

Vinnie Sookhoo. (Docs. 50; 120) Trooper Hartzig testified on direct and cross examination that Lloyd consented to the search of the hotel room that Dasinger occupied. (Doc. 120 at 17:2–4, 24:17–20, 29:10–14)

On September 4, 2014, the Court issued a written Order denying the motion to suppress. (Doc. 59) The Court determined that the initial search of the hotel room was constitutional under the third-party consent doctrine because it was "undisputed that Lloyd gave his consent for Troopers Hartzig and Rios to enter and search Room 258, which was rented by Lloyd and occupied by [Dasinger and co-defendant Patterson]." (*Id.* at 7) Lloyd had not testified at the suppression hearing, and the Court found that there was no evidence in the record to dispute that he had leased and consented to the search of Dasinger's room. (*Id.* at 4) Thus, the Court was not required to resolve factual disputes about whether law enforcement "barged into" Dasinger's room or entered with her permission. (*Id.* at 4, 9)

After the denial of the motion to suppress, the Government extended a second plea offer. The Government agreed to waive the mandatory life sentence under Section 841(b)(1)(A) based on the enhancement for two or more prior felony drug convictions, if Dasinger pleaded guilty to the possession of methamphetamine count and agreed to an enhancement based on one prior felony drug conviction. If Dasinger accepted the second plea offer, she faced a sentence between twenty years of prison and life. *See* 21 U.S.C. § 841(b)(1)(A) (2013). (Doc. 121 at 5:3–10; Civ. Doc. 2 at 4) Dasinger rejected this offer. (Civ. Doc. 2 at 4–5)

On September 12, 2014, three days before Dasinger's trial was scheduled to begin, Dasinger filed a motion to continue and motion for rehearing based on discovery of a new witness, Lloyd, whose testimony would contradict the testimony at the suppression hearing regarding consent. (Doc. 65) Specifically, Dasinger's counsel, Ray Lopez, represented that:

> On September 10, 2014 the undersigned counsel received a telephone call from a person who represented himself to be James Lloyd. Mr. Lloyd advised the undersigned counsel that he had never given law-enforcement permission to search the Defendant's room and that they had in fact gone up to the room without him knowing about it. The undersigned counsel advised Mr. Lloyd that an investigator would be interviewing him shortly to take his statement and to await their telephone call. Mr. Lloyd lives in the Brooksville, Florida area. Since the telephone conversation with the undersigned counsel, nobody has been able to reach Mr. Lloyd.

(*Id.* at ¶¶ 3–5) Thus, Lopez requested a continuance so that he could locate and subpoena Lloyd for a rehearing on the motion to suppress. (*Id.* at ¶ 6) The Court denied the motion to continue because the Government's response to the suppression motion filed on July 28, 2014 made clear Lloyd's consent was at issue, and "Defendant had ample time between the filing of the Government's response and the hearing to locate and interview Lloyd." (Doc. 66) However, the Court stated that if Lopez was able to locate and secure Lloyd's presence at the beginning of trial, it would "permit an opportunity for Lloyd to be heard." (*Id.*)

On the morning of trial on September 15, 2014, the Court addressed the issue of the Government's prior plea offers and Dasinger's concern about Lopez's ineffective

assistance for his failure to subpoena Lloyd to appear at the suppression hearing and at the first day of trial. (Doc. 121 at 4–30) In response to Dasinger's concern, Lopez made the following statement to the Court:

> [Trial counsel:]    Your Honor, again, this was at the eleventh hour. [Dasinger] advised me that Mr. Lloyd was going to be calling me. And I think he called me on Thursday. The first thing I did was I got an investigator, prospectively, to see if they could go up there and interview Mr. Lloyd. Mr. Lloyd called me, as I stated in the motion. I did not have — get all of his — I had his phone numbers, I didn't get any of his other information because I said the investigator is going to be calling you right after we get off the phone or shortly thereafter.
>
> Subsequent to that, I made several phone calls to Mr. Lloyd because my investigator advised me later on that he couldn't get ahold of Mr. Lloyd, and that he had left messages, went straight to voicemail, and he left messages for Mr. Lloyd. I attempted to call Mr. Lloyd as well, no response. According to my investigator, he also attempted to call him over the weekend. I've attempted to call Mr. Lloyd.
>
> I can understand Ms. Dasinger's concern that this individual could come in here and as far as the issue, at least as far as the motion to suppress, maybe not the trial, but effectively state that he never gave what, you know, the legal term, third-party consent to the police to go and search her room or have her removed from the room.

> And again, this was not presented to me until late last week. I did my best short of actually going up there to search myself for Mr. Lloyd.

(*Id.* at 14:17–15:17) Lopez also advised the Court that he made a strategic decision not to call Lloyd to testify at the August 21, 2014 suppression hearing because both he and Assistant Federal Public Defender Howard Anderson, counsel for Dasinger's co-defendant, believed that Lloyd was working with the Government. (*Id.* at 16:20–17:8) Based on these representations, the Court found that Lopez's assistance was not ineffective and declined Dasinger's request to terminate his services. (*Id.* at 17:10–18:22) The Court also provided Dasinger with additional time to review with her attorney the amended plea offer, which the Government had not withdrawn, and the Court conducted a colloquy of Dasinger thereafter to ensure her decision to decline the offer was knowing and voluntary. (*Id.* at 18:23–19:4, 28:1–30:23)

Dasinger proceeded to trial. At trial the Government presented the following evidence. Dasinger's co-defendant, Patterson, testified that he and Dasinger were in a romantic relationship for three months, both sold methamphetamine, and each obtained methamphetamine from different suppliers. (Doc. 121 at 112–13) Lloyd rented a hotel room for Patterson and Dasinger, Patterson and Dasinger drove to the hotel in a Toyota that Dasinger borrowed from a friend, and both spent the night in the room. (Doc. 121 at 113–14) Patterson kept eight ounces of pink methamphetamine in the hotel room for safekeeping, and Dasinger kept four ounces of white methamphetamine. (Doc. 121 at 115)

Patterson testified that, on October 8, 2013, he and Dasinger learned that law enforcement had come to the hotel. (Doc. 121 at 115–16) Patterson became concerned because a police officer had detained Lloyd, and Patterson and Dasinger kept drugs in the hotel room. (Doc. 121 at 161) Dasinger placed her drugs in a pink purse, Patterson placed his drugs in a box, and Dasinger and Patterson placed the purse and the box in a blue backpack. (Doc. 121 at 117) Also, Dasinger saw a firearm that belonged to Patterson in the backpack. (Doc. 121 at 119) Patterson placed the backpack in the trunk of the Toyota. (Doc. 121 at 117) In the hotel room, Patterson and Dasinger hid a scale used to weigh methamphetamine and small bags used to package methamphetamine under a mattress. (Doc. 121 at 118)

Highway patrol troopers searched the hotel room, found a marijuana cigarette in an ashtray, two digital scales and small plastic bags hidden under the mattress of the bed, and a set of car keys that belonged to the Toyota parked outside. A canine that sniffed the outside of the Toyota alerted the troopers to the presence of drugs in the trunk. In the trunk of the Toyota, the troopers found the blue backpack that contained the methamphetamine, marijuana, $4,900.00 in cash, and the firearm.[2] (Doc. 121 at 139–51, 180–81, 187–90)

On the basis of this information, an agent with the Drug Enforcement Administration transported Dasinger from the hotel to the parking lot of the county

---

[2] At trial, Dasinger stipulated that the firearm was manufactured outside of Florida and therefore affected interstate commerce and that one bag in the blue backpack contained a substance that was methamphetamine and weighed 131.8 grams and a second bag contained a substance that was methamphetamine and weighed 199.5 grams. (Doc. 121 at 172–73)

jail. After Dasinger waived her constitutional rights, the agent interrogated Dasinger. (Doc. 121 at 201–03) Dasinger admitted that four ounces of the methamphetamine belonged to her, that eight ounces belonged to Patterson, that she placed her four ounces in the backpack, that she obtained her four ounces from a supplier in Brooksville on consignment, that the firearm belonged to Patterson, that she might have touched the firearm, that her friend's father owned the Toyota, and that Lloyd rented the hotel room. (Doc. 121 at 203–05) The agent testified that an ounce of methamphetamine cost between $1,200.00 and $1,500.00 and consists of 28.35 grams and that an ounce of methamphetamine is not a quantity that a user would purchase for personal use. (Doc. 121 at 200)

At the end of the Government's case-in-chief, Dasinger moved for a judgment of acquittal on all counts and renewed all previous motions, which requests were denied. (*Id.* at 217:20–220:8) The Court confirmed its prior rulings on the suppression motion and motion for rehearing, explaining that Dasinger had failed to identify any new evidence that would alter those rulings. (*Id.*) Dasinger was found guilty of both drug offenses and the possession-in-furtherance offense and was found not guilty of the felon-in-possession offense. (Docs. 75, 104, 105)

Because the Government filed notice of the enhancement under Section 851 based on two or more prior felony drug convictions, the Court imposed two concurrent mandatory life sentences for each drug conviction. To comply with Section 924(c), the Court imposed a consecutive mandatory five-year sentence for the possession of a firearm in furtherance of a drug trafficking crime conviction. 18 U.S.C.

§ 924(c)(1)(A)(i), (c)(1)(D)(ii) (2013). (Docs. 101, 105 at 2, 123 at 11:22–14:1) Dasinger appealed her convictions and sentences. (Doc. 110) The Eleventh Circuit affirmed, after determining that this Court appropriately denied the suppression motion based on the evidence before the court, the motion for rehearing, the motion for continuance, and the motion for judgment of acquittal. (Doc. 129) The court of appeals further determined that the mandatory life sentences were not substantively unreasonable and did not violate the Eighth Amendment. (*Id.*)

### B.   Dasinger's § 2255 Motion and Relevant Evidence

Dasinger then filed a motion pursuant to 28 U.S.C. § 2255 seeking to vacate her sentence. (Civ. Doc. 1) In support of her motion, Dasinger proffered a sworn affidavit from Lloyd, in which he denied ever consenting to a search of the hotel room in which Dasinger was staying. (Civ. Doc. 2-1 at ¶¶ 8–11) He also averred that he had attempted to contact Dasinger's attorney on several occasions prior to and after the suppression hearing and was always available and willing to testify on her behalf. (*Id.* at ¶¶ 12–15) He stated that, though he got through to Lopez's secretaries, he never spoke to Lopez or was contacted by him. (*Id.*)

The Government proffered Lopez's competing affidavit in response. (Civ. Doc. 6-1) Lopez attested that Lloyd "never contacted [his] office prior to the hearing on the motion [to suppress]" and that his secretary never took any calls from Lloyd. (*Id.* at 5) Lopez averred that he "asked [Dasinger] on several occasions about Mr. Lloyd but she had no information on him." (*Id.*) Counsel also attested that prior to Dasinger's trial, he "did speak to someone who purported to be Mr. Lloyd by telephone." (*Id.*) Lopez

then contacted private investigator Patrick Lee about arranging to have Lloyd interviewed. (*Id.* at 5–6) Lopez avers that repeated attempts were made to contact Lloyd on Thursday, September 11, 2014, the following day, and the weekend prior to trial. (*Id.* at 6) The Court held an evidentiary hearing to address the factual dispute raised by these competing affidavits. (Civ. Docs. 11, 19)

### 1.   Lloyd's Testimony

At the hearing, Lloyd testified consistent with his affidavit that he was never asked nor did he consent to a search of the room that Dasinger and Patterson occupied. (Civ. Doc. 22 at 13:16–22; 24:17–19) Lloyd testified that after Dasinger's arrest, a mutual friend contacted him and explained that Lloyd might have information helpful to Dasinger's case. (*Id.* at 15:8–24)

Lloyd explained that he did not personally have a phone but was consistently with people who had phones. (*Id.* at 16:19–17:4) Lloyd further testified that he attempted to contact Lopez at least three times from various people's phones, (*Id.* at 19:8–18), but during his testimony he discussed what appears to be six different attempts. Lloyd first used a phone belonging to his cousin Josh, with whom he lived, to contact Lopez.  (*Id.* at 15:25–16:11) Lloyd stated that the second time he called Lopez from Josh's phone, he left a voice mail on an answering machine. (*Id.* at 17:8–24) Lloyd also attempted to call Lopez from Dasinger's father's phone, but Lopez did not answer. (*Id.* at 16:12–22) At some point, Lloyd also called Lopez from his friend Eugene's phone. (*Id.* at 18:2–12) During this call, Lloyd testified that he spoke

to Lopez's secretary who attempted to transfer him to Lopez's cell phone, but the call was terminated. (*Id.*) Lloyd stated that he believed he also attempted to contact Lopez on two additional occasions using Josh's and Eugene's phones, but he could not reach Lopez on either attempt and did not leave a voicemail on these occasions. (*Id.* at 19:16–20:1,14–24) Lloyd testified that he only left a voicemail for Lopez one time, (*Id.* at 20:19–21:4), and that he never spoke to Lopez, either on the phone or in person. (*Id.* at 21:6–9) Lloyd also testified that while he was trying to get in touch with Lopez, Dasinger's father visited him at his residence to speak about the case, but no lawyer or investigator ever visited him there. (*Id.* at 22:24–23:10) Lloyd had been living at this residence for "about seven years" at the point in time that he was trying to contact Lopez, and he had "family members that live[d] all up and down that street." (*Id.* at 21:16–22:1, 11–23)

### 2. Dasinger's Father's Testimony

Dasinger's father also testified at the evidentiary hearing. He testified that he had known Lloyd for 10 to 15 years, and he lived 5 to 10 miles away from him. (*Id.* at 32:25–33:7) Dasinger's father allowed Lloyd to use his phone to call Dasinger's lawyer "a couple [of] times" and he witnessed Lloyd unsuccessfully try to get in touch with Lopez "[s]everal times," including the time he got through to Lopez's secretary. (*Id.* at 31:8–9, 20–32:2) He testified that he knew of and had visited Lloyd's residence, but Lopez never reached out to him to ask for assistance in locating Lloyd. (*Id.* at 32:6–17) Dasinger's father also testified that Lloyd tried to call Lopez several times

before the trial, (*Id.* at 35:3–10), and that he heard Lloyd leave voicemails for Lopez "[a] couple" of times. (*Id.* at 36:1–5) However, Dasinger's father never called Lopez to provide Lloyd's contact information. (*Id.* at 36:6–8)

### 3.    Dasinger's Testimony

Dasinger testified at the hearing that she tried to get Lloyd in contact with Lopez by speaking to Lloyd directly and by asking her father and "Gene" to go to Lloyd's home and let him use their phones to contact her attorney. (*Id.* at 39:21–40:13) She testified that she personally had ways for Lopez to get in touch with Lloyd, but Lopez never asked for her assistance in doing so. (*Id.* at 41:19–24) She also testified that she knew that Lloyd was willing to come to Court to testify on her behalf for the motion to suppress hearing, and that she advised Lopez of this, but Lopez "stated that he had it under control just with the hotel manager" and "didn't need [Lloyd]." (*Id.* at 41:24–42:3) She reiterated that Lopez never discussed his inability to find Lloyd with her or asked for her assistance reaching him, though she would have been able to facilitate their communication if asked. (*Id.* at 42:4–16)

### 4.    Lopez's Testimony

Attorney Lopez also testified at the hearing. Lopez stated that he first learned of Lloyd's involvement in the case from his review of the police report, but this review alone did not prompt him to seek out Lloyd for any purpose. (*Id.* at 46:1–12) Contradicting Dasinger's testimony, Lopez testified that when he discussed Lloyd with her, "she indicated that she did not know how to get a hold of him." (*Id.* at

46:16–18) Lopez testified that he asked Dasinger whether she had had discussions with Lloyd concerning his consent to the search, and "she didn't have any knowledge of that." (*Id.* at 46:24–47:5)

Lopez further testified that he made a strategic decision along with Assistant Federal Public Defender Howard Anderson, counsel for Dasinger's co-defendant, not to call Lloyd as a witness for the suppression hearing because they had other witnesses available. (*Id.* at 46:16–23, 60:17–61:11) Specifically, Lopez explained that the hotel manager's testimony contradicted that of the police and bolstered the defense theory that the entry to Dasinger's room was not consensual. (*Id.* at 47:19–48:3; 61:5–11) However, Anderson, not Lopez, interviewed the hotel manager, so Lopez could not testify whether the hotel manager was asked about his knowledge of Lloyd's consent. (*Id.* 62:18–63:12) Further, Lopez and Anderson believed, (apparently mistakenly) that Lloyd was cooperating with the Government because police had arrested Lloyd but the prosecutor had not charged Lloyd with a crime. (*Id.* at 48:4–9) Lopez concedes that he did not investigate this belief and admits that it was solely a "hunch." (*Id.* at 66:2–10)

After the denial of the suppression motion, Lopez claimed that he still did not think that Lloyd would be a helpful witness to Dasinger's case. (*Id.* at 68:14–17) However, Lopez testified that an individual who represented himself to be Lloyd contacted his office "either four or five days prior to the trial" and indicated that he never consented to a search of either room that he had rented at the hotel. (*Id.* at 48:20–49:20) At this point, Lopez believed Lloyd could be an important and beneficial

witness to Dasinger's case. (*Id.* at 69:17–23) Lopez testified that he told Lloyd over the phone that a private investigator would "probably" be contacting him, and Lloyd indicated that he understood. (*Id.* at 50:8–12) Lopez also told Lloyd that "he may receive a subpoena and that he may be directed to show up in court for this trial." (*Id.* at 51:3–5) Lopez did not document Lloyd's address during this call, but Lopez said he "was going to have [his] investigator call [Lloyd] and get all his information." (*Id.* at 70:4–11)

According to Lopez, immediately after speaking with Lloyd, he contacted private investigator Lee, provided Lee with Lloyd's phone number, and asked Lee to contact Lloyd. (*Id.* at 49:23–50:7) Lopez also testified that after their initial discussion, he personally called Lloyd "a number of times and there was no answer." (*Id.* at 51:6–7) Lopez also "sent several e-mails" to Lee explaining the issues in the case and what topics he wanted Lloyd interviewed about, so that Lopez could get Lloyd's "written statement tied down." (*Id.* at 51:8–11) Lopez testified that he e-mailed Lee over the course of the weekend before trial and Lee indicated he could not get in contact with Lloyd. (*Id.* at 51:12–15)

Lopez testified that he was not sure what else he or Lee could have done to locate Lloyd in the short window of time that they had. (*Id.* at 72:16–73:9) He conceded, however, that he could have had Lee run a background check on Lloyd to find his telephone number, address, and other information, but he is not aware of Lee doing that in this case. (*Id.* at 71:2–14) In addition to calling Lloyd directly and having his investigator reach out by phone, Lopez also filed a motion for continuance and

rehearing, which was denied, and he advised the Court the morning of trial about his efforts to contact Lloyd. (*Id.* at 51:17–53:8) Lopez testified that he called Lloyd approximately ten to fifteen times after their initial conversation with no response and he attempted to get Lee to contact with Lloyd. (*Id.* at 53:2–8) Lopez did not recall asking Dasinger's father how to contact Lloyd, though he discussed the case "extensively" with him during the course of his representation. (*Id.* at 53:15–21; 79:13–18)

Regarding his efforts during plea negotiations, Lopez testified that he told Dasinger as early as their first meeting that she faced a potential mandatory minimum sentence of life imprisonment. (*Id.* at 55:13–16) He stated that he discussed this potential penalty with Dasinger "every time [he] met with her" prior to filing the motion to suppress, and "it was always part of the decision of whether or not to file the motion to suppress." (*Id.* at 55:19–23) Lopez testified that even after he explained to her that the plea deal would likely not be on the table if they went forward with the motion to suppress and were unsuccessful, Dasinger was "very adamant" from the inception of the case that law enforcement had violated her Fourth Amendment rights. (*Id.* at 56:6–17) Lopez testified that he advised Dasinger that she had a very viable motion to suppress, but this advice was tempered "with the knowledge that because of her four prior qualifying felonies that she — the Court would have no discretion but to sentence her to life . . . ." (*Id.*)

Lopez further testified that after the denial of the suppression motion, the Government offered to withdraw one of the enhancements under Section 851 based

on a prior drug conviction and offer a 20-year minimum mandatory, which he discussed with Dasinger as well. (*Id.* at 57:3–10) Lopez testified that Dasinger advised "right away [that] she wasn't interested" because she wanted to preserve her right to appeal the motion to suppress, and, even though counsel advised her that she might be able to get back towards what he viewed was her proper guideline by cooperating, she did not want to cooperate either. (*Id.* at 57:14–17)

### C.   Supplemental Evidence

The Court stayed its ruling on the § 2255 motion pending further review of the evidence and directed that the Parties attempt to subpoena telephone and email records to corroborate the conflicting testimony from Lloyd and Lopez. (*Id.* at 110:9–115:3) Thereafter, Dasinger submitted supplemental evidence in support of her motion. (Civ. Doc. 17) Dasinger indicated that she subpoenaed the records for four telephone numbers from Boost Mobile, one for Dasinger's friend Eugene and three for Dasinger's father. (Civ. Doc. 17 at 2–3) The records could not be obtained, however, due to the passage of time. (Civ. Doc. 17-2) Dasinger also subpoenaed the records for one number from the Tracfone associated with Lloyd's cousin Josh. (Civ. Doc. 17 at 4) These records did not reveal any calls made to either Lopez's office or cell phone number. (Civ. Doc. 17-4) However, the report for these records states that "[c]alls that are less than 15 seconds will not normally appear on the calls records." (Civ. Doc. 17-3) Thus, Dasinger contends that "it cannot be said that phone calls were not made from this phone number because calls less than 15 seconds, which would be the case if no one answered as alleged in this case, would not show up." (Civ. Doc. 17 at 4)

Finally, Dasinger subpoenaed phone records from AT&T associated with one additional number for Dasinger's father during the relevant time. (*Id.* at 5) These records did not reveal any calls made to either Lopez's office or cell phone number. (Civ. Doc. 17-6) However, because the AT&T number was not the only phone number for Dasinger's father, this evidence neither corroborates nor refutes any testimony from the hearing.

Dasinger also requested that the Court review, *in camera*, Attorney Lopez's CJA voucher from this case. (Civ. Doc. 17 at 5–6) The Court has done so, and that review has revealed five relevant time entries.[3] The first pertinent entry is from September 10, 2014, at which Lopez records that he billed .2 hours for "Telephone conversation with Private Investigator Patrick Lee about interviewing possible defense witness." There are three relevant entries on September 11, 2014: (i) .2 hours for "Telephone conversation with potential defense witness James Lloyd," (ii) .1 hours for "Telephone conversation with Private Investigator Patrick Lee about possible interview with possible defense witness James Lloyd," and (iii) .1 hours for "Review email from Private Investigator Patrick Lee advising that possible defense witness James Lloyd cannot be contacted." There is one relevant entry on September 12, 2014, the day that

---

[3] The Court attaches the CJA voucher to this Order. A Defendant waives attorney-client and work product privileges to the extent necessary to address an ineffective assistance of counsel claim. *See Johnson v. Alabama*, 256 F.3d 1156, 1178 (11th Cir. 2001) ("[A] party waives its attorney-client privilege when it injects into this litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct." (citation omitted)).

Lopez filed the Motion to Continue and for Rehearing on the Motion to Suppress. On this day, Lopez billed .1 hours for "Left telephonic message for possible defense witness James Lloyd." There are no further entries that mention Lloyd or Lee.

The Government also filed a Notice indicating that it attempted to secure Lopez's phone records, but they could not be obtained due to the passage of time. (Civ. Doc. 18) However, the Government did attach as supplemental evidence "the only email traffic maintained by Mr. Lopez relevant to the instant concerns." (*Id.*) This evidence consists of three brief emails between Lopez and Lee, all occurring on September 11, 2014. The first email from Lopez to Lee states:

> Patrick,
>
> Here is the police report or at least the part that is pertinent to our issue. I just spoke with Mr. Lloyd and he is willing to give a statement to you. He is awaiting your call.

(Civ. Doc. 18-2) Lopez provided Lee a number. (*Id.*)  Notably, Dasinger's post-conviction counsel was unable to identify and submit records for this number. (*See* Civ. Doc. 17) The second email from Lee to Lopez states:

> Ray,
>
> I have called this number 3 times, it goes to voice mail automatically. I have also sent him a text asking him to call me as soon as possible. I am not sure if he is at work and cannot call me back. I will wait again until early evening and attempt him again. I just wanted to keep you abreast of the situation.

(Civ. Doc. 18-2) The third and final email from Lopez to Lee at 9:03 P.M. states:

> Patrick,

> I just tried both different numbers since originally he gave out a wrong number and got voicemail on each as well. Oh well . . . . we'll see what happens tomorrow. Thanks for trying. At the very least maybe we have begun a new business relationship. LOL.
>
> I'll call you tomorrow if I hear anything.

(*Id.*) There are no further emails between Lopez and Lee after this exchange.

## II.   LEGAL STANDARD – INEFFECTIVE ASSISTANCE OF COUNSEL

In both Grounds of her motion, Dasinger claims ineffective assistance of counsel. To prevail on this claim, Dasinger must demonstrate that counsel's performance was deficient and that she was prejudiced by the deficiency. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). To establish deficient performance, Dasinger must show that "the identified acts or omissions were outside the wide range of professional competent assistance." *Id.* at 690. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id. Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*

Dasinger must also demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect

on the judgment." *Id.* at 691–92. To meet this burden, Dasinger must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

*Strickland* requires proof of both deficient performance and consequent prejudice. *Id.* at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998) ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.") (citation and internal quotations omitted).

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions

20

are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). *See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (counsel has no duty to raise a frivolous claim).

The two-part *Strickland* inquiry applies with equal force to ineffective assistance of counsel claims raised regarding the plea process. *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). The Sixth Amendment guarantee of effective assistance of counsel applies "to the negotiation and consideration of plea offers that lapse or are rejected." *In re Perez,* 682 F.3d 930, 932 (11th Cir. 2012) (citing *Missouri v. Frye,* 566 U.S. 134, 140 (2012) and *Lafler v. Cooper,* 566 U.S. 156, 162 (2012)). To satisfy the prejudice prong of the *Strickland* test in the context of plea negotiations, a petitioner must demonstrate a reasonable probability that: "(1) he would have accepted a plea offer but for counsel's ineffective assistance; (2) the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it; and (3) the plea would have resulted in a lesser charge or a lower sentence." *Frank v. United States,* 522 F. App'x 779, 781 (11th Cir. 2013) (citing *Frye,* 566 U.S. at 147 and *Lafler,* 566 U.S. at 163).[4]

## III.   GROUNDS

On August 7, 2017, Dasinger timely filed the instant motion to vacate, alleging two cognizable grounds of ineffective assistance of counsel. (Civ. Docs. 1, 2) In Ground One of her motion, Dasinger alleges that she was deprived of her right to

---

[4] 11th Cir. R. 36-2 ("Although an unpublished opinion is not binding on this court, it is persuasive authority.").

effective assistance of counsel during the plea negotiation process. (Civ. Doc. 2) In Ground Two, Dasinger alleges that trial counsel rendered ineffective assistance when he failed to investigate and secure the attendance of Lloyd, a vital witness, at her suppression hearing and prior to trial. (*Id.*)

## A.   Ground One

In Ground One, Dasinger claims that counsel was ineffective by failing to properly advise her about plea offers that would have substantially reduced her sentence. (*Id.* at 10–20) Where a defendant challenges a not-guilty plea based on ineffective assistance of counsel, she "must show that there is a reasonable probability that, but for counsel's errors, [she] would . . . have pleaded guilty and would not have insisted on going to trial." *Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995) (quotation and alterations omitted). A court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

### 1.   Deficient Performance

Dasinger first contends that she was not advised that she would be facing a mandatory life sentence for an enhancement under Section 851 when she rejected the Government's first plea offer of 10 years. (Civ. Docs. 1 at 4; 2 at 10–14) At the time she was presented with the first offer, Dasinger does not deny that she was aware she faced a penalty of twenty years to life. (Civ. Doc. 2 at 12) Dasinger contends in her verified motion that, when the first offer was brought to her, she and Lopez "discussed how accepting the plea would affect the motion to suppress" and that counsel advised

that "if the Petitioner took the plea, she would not be able to file the motion to suppress." (Civ. Doc. 1 at 4) She also attests that Lopez advised her that he "felt they had a good chance of success on the motion." (*Id.*) However, Dasinger contends that she "was not made aware, by trial counsel, that if she rejected the plea offer she would ultimately be facing a mandatory life sentence if convicted at trial." (*Id.*)

The Court finds that Dasinger has failed to meet her heavy burden of establishing deficient performance with regard to Lopez's advice related to the first plea offer. In his affidavit and at the October 9, 2018 evidentiary hearing, Lopez testified that Dasinger was made aware that she faced a potential mandatory minimum sentence of life imprisonment on numerous occasions prior to the Government's filing its notice of enhancement. (Civ. Doc. 22 at 55:13–23; Civ. Doc. 6-1 at 1–2) This is supported by a letter sent by Lopez to inform Dasinger about the Government's notice of enhancement. (Civ. Doc. 6-1 at 8) Lopez stated that he discussed this potential mandatory penalty with Dasinger "every time [he] met with her" prior to filing the motion to suppress, and "it was always part of the decision of whether or not to file the motion to suppress." (Civ. Doc. 22 at 55:19–23) Lopez testified that while Dasinger had what he believed to be a very viable motion to suppress, he tempered his advice on the suppression issue "with the knowledge that because of her four prior qualifying felonies that she — the Court would have no discretion but to sentence her to life." (*Id.* at 56:13–17) Dasinger did not contradict this testimony at the hearing, and her attorney did not cross-examine Lopez on this point. Thus, the Court credits Lopez's testimony that he properly advised Dasinger at the time of the first plea offer that the

Government might enhance her to a mandatory minimum life . As a result, the Court finds no error warranting a finding of deficient performance with regard to counsel's advice concerning the first plea offer.

Dasinger also contends that Lopez erred by failing to properly advise her concerning the Government's second plea offer of 20 years, made after her motion to suppress was denied and after she had been enhanced to a mandatory life sentence under 21 U.S.C. § 851. (*Id.*) She contends that she felt Lopez was "trying to bully her into accepting the plea without going over any of the details with her" and that Lopez failed to provide her with a copy of the written agreement. (*Id.*) She also attests that she "believed, based on Mr. Lopez's advice, that they would win the issue regarding the motion to suppress on appeal" and, thus, accepting the plea was not ideal. (*Id.*)

Lopez testified that after the denial of the suppression motion, he shifted his efforts to try to convince the Government to extend to Dasinger another plea offer. (Civ. Doc. 22 at 80:4–12) The Government extended a second offer and agreed to waive the mandatory life sentence under Section 841(b)(1)(A) based on the enhancement for two or more prior felony drug convictions, if Dasinger pleaded guilty to the possession of methamphetamine count and agreed to an enhancement based on one prior felony drug conviction. (Doc. 121 at 6:22–7:1) If Dasinger accepted the second plea offer, she faced a sentence between twenty years of prison and life. *See* 21 U.S.C. § 841(b)(1)(A) (2013). Lopez discussed this offer with Dasinger prior to her trial, but he did not have a copy of the written agreement to show her. (Civ. Doc. 22 at 57:20–58:13; Doc. 121 at 7:2–24)

24

Lopez testified that Dasinger's decision "right away was she wasn't interested" because she wanted to preserve her right to appeal the motion to suppress, and even though counsel advised her that she might receive a significantly reduced sentence if she cooperated, she refused to enter a plea agreement that waived her right to appeal. (Civ. Doc. 22 at 57:12–17) In her sworn motion, Dasinger admits that Lopez discussed the plea with her but contends that Lopez was "trying to bully" her into accepting the plea without going over the details. (Civ. Doc. 1 at 4) However, on the morning of trial, the Court allowed Dasinger to review and discuss the written agreement with Lopez. (Doc. 121 at 18:23–19:4) At that time, the Government had not withdrawn the plea. (Doc. 121 at 28:9–30:22) As such, the Court finds that Dasinger had a sufficient opportunity to consider the terms of the second plea offer.

Dasinger also alleges in her verified § 2255 motion that she "believed, based on Mr. Lopez's advice, that they would win the issue regarding the motion to suppress on appeal" and accepting the second plea offer would not allow her to appeal that issue. (Civ. Doc. 1 at 5) However, she does not elaborate on what advice caused this belief. (*Id.*) "[T]here is a difference between expressing optimism about a defendant's chances at trial [or on appeal] and guaranteeing that the defendant will win." *Teers v. United States*, 739 F. App'x 960, 966–67 (11th Cir. 2018) (finding insufficient evidence of counsel's defective performance when counsel allegedly advised defendant that he had a 70 to 80 percent chance of winning at trial); *c.f. Lafler*, 566 U.S. at 163 ("In this case all parties agree the performance of respondent's counsel was deficient when he

advised respondent to reject the plea offer on the grounds he **could not be convicted** at trial.") (emphasis added).

In her unsworn memorandum, Dasinger states that she "was advised that she would win [the suppression] issue on appeal," and that had she "known that success was not a guarantee," she would have accepted the plea. (Civ. Doc. 2 at 16) However, these unsworn statements are not evidence, there is no evidence in the record to support that Lopez guaranteed her a win, and this assertion is affirmatively contradicted by Lopez's sworn statement that he advised Dasinger "on numerous occasions that he has seen very few favorable decisions from the Eleventh Circuit" on similar motions to suppress. (Civ. Doc. 6-1 at 4); *Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013) ("[A] sentence in an unsworn brief is not evidence."). Thus, as no record evidence supports that Lopez advised Dasinger she would win her suppression motion on appeal, there is no basis to find deficient performance in this regard.

Finally, Dasinger cites to *United States v. Correa*, Nos. 1:07-cr-11-RH-GRJ and 1:12-cv-61-RH-GRJ, 2014 WL 5148214 (N.D. Fla. 2014), a case in which the court found that it was error for counsel to advise a defendant that he could only preserve his right to challenge an unfavorable suppression order by proceeding to trial. (Civ. Doc. 2 at 16–17) In *Correa*, the court found that this advice was "probably wrong" because a defendant may enter a conditional plea with the Government's consent, and there was no reason to believe the Government would not have consented in that case. 2014 WL 5148214 at *1. Dasinger states in her memorandum that, like the defendant

in *Correa*, she was also "told that she could only preserve her motion to suppress by proceeding to trial." (Civ. Doc. 2 at 17) Again, this factual assertion is unsupported by any sworn statement or other evidence. Moreover, Lopez attests that he asked the Government "about the possibility of a conditional plea allowing [Dasinger] to appeal the denial of the Motion to Suppress but this was never offered." (Civ. Doc. 6-1 at 4) Thus, absent any evidence that Dasinger was similarly advised, and given the uncontested evidence that the Government would not have consented to a conditional plea in this case, *Correa* is inapposite.

### 2. Prejudice

Even assuming that counsel's performance was deficient, Dasinger cannot satisfy the prejudice prong of the *Strickland* test. To establish this prong, Dasinger must present some objectively credible evidence demonstrating that but for counsel's alleged advice or inaction, she would have accepted the plea offers. A petitioner's after-the-fact testimony concerning the desire to enter a plea, without more, is insufficient to establish prejudice. *Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991). Dasinger points to (i) the lack of evidence that she repeatedly insisted on proceeding to trial or made protestations of innocence pre- or post-trial, (ii) the Government's substantially strong evidence supporting a guilty verdict at trial, and (iii) the disparity between her ultimate sentence and the sentences contained in the plea offers.

However, the record belies Dasinger's contention that she would have accepted the plea offers. While Dasinger is correct that she did not profess her innocence or desire to go to trial, she did vehemently and repeatedly assert that law enforcement

violated her Fourth Amendment constitutional rights. She did so (i) in her hotly contested motion to suppress and at the evidentiary hearing, (ii) in her motion for rehearing on the motion to suppress, (iii) when she renewed her motion to suppress at the conclusion of the Government's case-in-chief at trial, and (iv) when she raised the Fourth Amendment issue on appeal. Lopez swore in his affidavit and testified at the hearing that Dasinger was always adamant that law enforcement had violated her Fourth Amendment rights and that Dasinger rejected the plea offers for that reason. (Civ. Doc. at 56:6–17, 57:12–17; Civ. Doc. 6-1 at 2–4)

Also, as explained above, Dasinger rejected the Government's first offer to avoid the mandatory life sentence and to instead face a sentence of ten years of prison to life. Dasinger rejected the Government's second offer to avoid the mandatory life sentence and to instead face a sentence of twenty years of prison to life. Dasinger's rejection of these two extremely favorable offers and her willingness to risk a mandatory life sentence at trial further demonstrate that, even if trial counsel had not deficiently performed, Dasinger would have still insisted on going to trial.

Lastly, on the morning of trial, the Court conducted a colloquy with Dasinger about the second plea offer. Dasinger, under oath, first wavered about whether she would accept the second plea offer (Doc. 121 at 9–10):

| [Court:] | Ms. Dasinger, did you see the plea agreement that proposed that you be subject to a ten-year minimum mandatory sentence? |
|---|---|
| [Dasinger:] | Yes, ma'am. |

28

[Court:]     And did Mr. Lopez explain to you that the new proposal the Government was making would be that you would face the same benefits and detriments as the other plea agreement except that you would be subject now to a twenty-year minimum mandatory?

[Dasinger:]    Yes, ma'am.

[Court:]     Did you understand all of the terms of the original plea agreement with the ten-year mandatory minimum?

[Dasinger:]    Yes, ma'am.

[Court:]     And did you reject that plea agreement at that time?

[Dasinger:]    Yes, ma'am.

[Court:]     And so if Mr. Lopez tells you that the agreement is the same except that you now face a twenty-year mandatory minimum, do you need to see that in order to make a decision about what you want to do?

[Dasinger:]    Yes, ma'am.

[Court:]     Is it your suggestion that if it's the same as the original one except that now it's a twenty-year mandatory minimum, that you would have accepted that plea agreement?

[Dasinger:]    I would have thought about it after going over it with him as well.

After the Court provided Dasinger and Lopez additional time to review the written agreement memorializing the second plea offer, Dasinger, under oath, knowingly and voluntarily rejected the offer (Doc. 121 at 28–30):

| | |
|---|---|
| [Court:] | All right. Ms. Dasinger, reminding you that you're under oath, you've had an opportunity to review the plea agreement? |
| [Dasinger:] | Yes, ma'am. |
| [Court:] | Was it explained to you by your lawyer? |
| [Dasinger:] | Yes, ma'am. |
| [Court:] | Do you understand the terms of the plea agreement? |
| [Dasinger:] | Yes, ma'am. |
| [Court:] | Do you feel you had a full opportunity to consider it and make an informed decision about how you wish to proceed? |
| [Dasinger:] | Yes, ma'am. |
| [Court:] | And how do you wish to proceed? |
| [Dasinger:] | I'm not signing it. |
| [Court:] | Is anyone threatening you to get you to not sign it? |
| [Dasinger:] | No, ma'am. |
| [Court:] | Has anyone promised you anything to get you not to sign it? |
| [Dasinger:] | No, ma'am. |

[Court:]    You understand that if you're convicted in this case, you will face a mandatory life term of incarceration?

[Dasinger:]   Yes, ma'am.

[Court:]    And if you sign the plea agreement, you would face a twenty-year mandatory minimum?

[Dasinger:]   Yes, ma'am.

[Court:]    And you also understand that your lawyer does not intend to call any witnesses on your behalf?

[Dasinger:]   Yes, ma'am.

[Court:]    And still you wish not to plead guilty?

[Dasinger:]   I mean I ain't got no — I asked him to call witnesses, so what can I say on that?

[Court:]    You mean Mr. Lloyd?

[Dasinger:]   Yes, ma'am.

[Court:]    But Mr. Lloyd would only be here to testify on the motion to suppress. Mr. Lloyd would not vindicate you on the items found in the car. You understand that?

[Dasinger:]   Yes, ma'am.

[Court:]    This is a very serious decision you're making here, Ms. Dasinger, and the Court does not want you to say, well, I didn't get an opportunity to consider this, I made this decision under any kind of duress or stress. You're making this decision voluntarily, is that correct?

| [Dasinger:] | Yes, ma'am. Is there anyway I can have a few days to think about this or no? |
|---|---|
| [Court:] | Not at this point. The Court has given you an opportunity to consider the plea, the Government has proposed a plea. I can't make the Government hold out the plea indefinitely for you in connection with this matter. And we have a jury downstairs who is prepared to consider this case. I don't know if the Government is willing to hold out any hope on this plea agreement after the jury is selected or not. Mr. Preston? |
| [Prosecutor:] | Judge, the Court's colloquy was sufficient. The Government's offer expired last week and the additional opportunity was something I was willing to go along with, but that plea agreement has now dissolved. |

Thus, Dasinger's contention that she would have accepted these plea offers but for counsel's alleged deficient performance is unpersuasive. As such, the Court does not find either deficient performance or prejudice, and Dasinger's claim of ineffective assistance as it pertains to the plea negotiations is without merit.

## B.   Ground Two

In Ground Two of her motion, Dasinger claims ineffective assistance of counsel premised on Lopez's failure both before and after the suppression hearing to locate and subpoena Lloyd to testify on her behalf regarding the issue of consent. (Civ. Doc. 1 at 6–8)

### 1.   Deficient Performance

Dasinger's claim of ineffectiveness stems from Lopez's decision to limit the scope of his investigation into potentially favorable evidence. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Mitchell v. Kemp*, 762 F.2d 886, 888 (11th Cir. 1985) ("A criminal attorney has the duty to investigate, but the scope of investigation is governed by a reasonableness standard.").

Dasinger's argument concerning the reasonableness of counsel's investigation into Lloyd can be divided into two key time frames: (i) the period leading up to Dasinger's suppression hearing; and (ii) the period after the Court's Order denying the motion to suppress and leading up to trial. The Court addresses Lopez's conduct during each time frame respectively to determine if, consistent with *Strickland*, his failure to investigate or locate Lloyd was reasonable in the light of all the circumstances. *Strickland*, 466 U.S. at 688.

### a.   Period Leading Up to the Suppression Hearing

The Court first examines whether Lopez was deficient for failing to investigate the viability of Lloyd as a witness leading up the suppression hearing. *Strickland*, 466 U.S. at 691, explains:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

At the evidentiary hearing, Dasinger testified that she and Lopez discussed Lloyd as a possible witness. She is also adamant that she made Lopez aware that Lloyd "would be willing to come to Court and testify on [her] behalf" at the suppression hearing, but Lopez said "he had it under control with just the hotel manager" and "didn't need" Lloyd. (Civ. Doc. 22 at 40:23–25, 41:24–42:3) Lopez admits that he and Dasinger discussed Lloyd as a possible witness and that *he never made any effort* to find Lloyd prior to the suppression hearing. (*Id.* at 46:16–23, 67:17–20) Lopez's explanation for his failure to investigate Lloyd as a witness is that both he and Anderson, the co-defendant's counsel, believed that Lloyd was cooperating with the Government "since [Lloyd] had been arrested for drug dealing and was never charged." (Civ. Doc. 6-1 at 5) Lopez concedes that this belief was just a "hunch" and that neither he nor the co-defendant's counsel took any steps to confirm or dispel this belief. (Civ. Doc. 22 at 66:2–10) However, Lopez testified that, based solely on this hunch, he made a strategic decision to call only the hotel manager to testify, since this testimony bolstered

Dasinger's claim regarding the manner in which law enforcement entered her hotel room and contradicted that of Trooper Hartzig. (*Id.* at 47:19–48:12)

The Court finds that the initial thinking to forgo any investigation into Lloyd and focus on the hotel manager as the defense's key witness was reasonable at the time that counsel filed the motion to suppress, as counsel had no reason to know that Lloyd's alleged third-party consent would be the principal basis for the Government's opposition to the motion. However, the decision not to investigate Lloyd as a witness became unreasonable after the Government filed its response to the suppression motion.

Once the Government filed its response, Lopez's need to investigate Lloyd was heightened because the Government contended as its principal defense to the motion that Lloyd, a co-tenant, gave law enforcement consent to search the hotel room (Doc. 40 at 2–6):

> In this case, the troopers received adequate consent to search the hotel room by Lloyd, the renter of the room. The troopers reasonably believed that Lloyd possessed the authority to grant permission to search the room because the room was registered to him and paid for by him. Furthermore, the Defendant did not object to the search when the troopers came to the door and even invited the troopers in after they had told her that Lloyd had consented. The defendant's lack of protest and invitation into the room reveals her understanding of Lloyd's authority over the room. Her invitation into the room also supports the troopers' reasonable belief and understanding that Lloyd had authority to consent to a search of the hotel room. Through both the invitation of the defendant to come into the room and the consent of Lloyd, it is clear that a man of reasonable caution would believe that Lloyd had the authority to grant consent to search the premises.

35

Neither Patterson nor the defendant objected to the troopers' search when the troopers told them that Lloyd had consented and Patterson even admitted at the time that he did have illegal drugs in the room. It is clear that the troopers acted in good faith on Lloyd's consent when they searched the hotel room, having the reasonable belief that he had the authority to grant consent to search.

At the evidentiary hearing, Lopez acknowledged that at this point, Lloyd's testimony, if favorable, would be important to Dasinger's case, testifying thusly:

| | |
|---|---|
| [PCR counsel:] | So on that same kind of [notion], if the Government's, in their response, main argument was that the search of Ms. Dasinger's room was legal because a co-tenant, Mr. Lloyd, had consented to the search, would you agree that would have been something important to look into? |
| [Lopez:] | If that had — if the Government had indicated that it was okay to search both rooms, we may have looked into it, yes. |
| [PCR counsel:] | And the reason I ask that is because would you agree that whether or not Mr. Lloyd consented to the rooms would have essentially been — if that question had been answered negatively, that would have ended the entire analysis of every other option that came after that, if that's what the Government was relying on? |
| [Lopez:] | Well, it — what it would have done is it would have provided another witness, and the Court would have had to resolve the — I guess the conflicts in what the witnesses were saying, because the police, of course, were never saying that Mr. Lloyd did not |

consent, they were saying that he consented.

[PCR counsel:]      Correct.

(Civ. Doc. 22 at 64:13–65:8)

Lopez conceded that he had no knowledge of whether his only other witness, the hotel manager, would be able to testify regarding Lloyd's consent, or lack thereof, to the search of the rooms because he did not even interview the hotel manager on which his entire defense rested — counsel for Dasinger's co-defendant did.

[PCR counsel:]      Now, would you agree, if you recall, the hotel manager did not have any information about any type of consent from Mr. Lloyd?

[Lopez:]      I believe that Mr. Lloyd — the information that we received was that Mr. Lloyd consented when he was being detained or arrested, when he got stopped in his car, so I don't know if the hotel manager testified whether he would have been privy to that or not.

. . .

[PCR counsel:]      But regardless of whose room first, whatever happened before the hotel manager got there, he did not know, obviously, if Mr. Lloyd had consented or not?

[Lopez:]      I can't recall specifically if he did or not.

[PCR counsel:]      Now, in terms of —

[Court:]      Well, when you talked to the hotel manager in preparation for his testimony, did he tell you he knew

|  |  |
|---|---|
|  | anything about whether Mr. Lloyd did or didn't give consent? |
| [Lopez:] | If he would have said that — I don't believe he did, because if he would have said that, that would have made me think that maybe we need to try to get a hold of Mr. Lloyd. |
| [Court:] | Did you talk to the hotel manager after the Government's response was filed? |
| [Lopez:] | I believe that myself or [counsel for the co-defendant] had, yes. |
| [Court:] | And did somebody ask him about what knowledge he had of Mr. Lloyd having consented or not having consented? |
| [Lopez:] | I do not recall. [Counsel for the co-defendant] was the one that located the hotel manager and [counsel for the co-defendant] was the one that had everything about what Mr. — about what he was going to testify to. |
| [Court:] | So did you meet with the hotel manager about the hearing? |
| [Lopez:] | I don't recall meeting with him. I recall meeting with [counsel for the co-defendant] and going over what he was going to say. |
| [Court:] | So you don't know what the hotel manager was going to say of your own work, only what [counsel for the co-defendant] said the hotel manager was going to say? |
| [Lopez:] | Correct. |

| [Court:] | And you don't know what [counsel for the co-defendant] asked of the hotel manager about Mr. Lloyd? |
|---|---|
| [Lopez:] | No. I just know what I discussed with [counsel for the co-defendant] about Mr. Lloyd. |
| [Court:] | But neither you nor [counsel for the co-defendant] had any information about Mr. Lloyd other than that he had been arrested and he had not been charged? |
| [Lopez:] | Yes. |

(*Id.* at 61:12–19, 62:1–63:16)

Relying solely on information from co-defendant's counsel about whether the hotel manager could provide Dasinger with favorable testimony on the issue of Lloyd's consent (which it appears he could not), and despite knowing that this issue would be a key hurdle to prevailing on the suppression motion based on the Government's response, and despite Dasinger's insistence that Lloyd would be a favorable witness, Lopez made no attempt to locate and investigate Lloyd. Under these circumstances, the decision not to investigate Lloyd cannot be said to be a reasonable, strategic decision made as part of a calculated trial strategy. Lopez "did not *choose,* strategically or otherwise, to pursue one line of defense over another. Instead, [he] simply abdicated his responsibility to advocate his client's cause." *Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985) (italics in original). At the evidentiary hearing, the Court indicated that one could argue Lopez's unsupported "hunch" was somewhat bolstered by the Government's response, as the Government would be unlikely to hang its entire

defensive strategy on a non-cooperative witness. (Civ. Doc. 22 at 108:6–13) However, given the obvious import of the consent issue to resolution of the suppression motion as highlighted by the Government's response, the Court finds that no reasonable counsel would have continued to rely on the "hunch" that Lloyd was a cooperating witness and refused to investigate further.

The "[i]nformed evaluation of potential defenses to criminal charges" is a cornerstone of effective assistance of counsel. *Mitchell*, 762 F.2d at 889 (quoting *Gaines v. Hopper,* 575 F.2d 1147, 1149–50 (5th Cir. 1978)[5]). While "'strategy' can include a decision not to investigate . . . [and] a lawyer can make a reasonable decision that no matter what an investigation might produce, he wants to steer clear of a certain course," *Rogers v. Zant,* 13 F.3d 384, 387 (11th Cir. 1994), the decision to forgo any investigation must be reasonable. *See Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Green v. Nelson*, 595 F.3d 1245, 1251 (11th Cir. 2010) ("[T]he Supreme Court has explained that decisions that are based on mistaken beliefs certainly are neither strategic nor tactical. . . . Rather, strategic decisions are ones that, among other things, involve a weighing of competing positive and negative consequences that may flow to the defendant from a particular choice."). "When a defense counsel fails to investigate his client's only possible defense, although requested to do so by him; and

---

5 *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (adopting as binding precedent all decisions of the former Fifth Circuit issued on or before September 30, 1981).

fails to subpoena witnesses in support of the defense, it can hardly be said that the defendant has had the effective assistance of counsel." *Gomez v. Beto*, 462 F.2d 596, 597 (5th Cir. 1972). Moreover, "counsel's anticipation of what a potential witness would say does not excuse the failure to find out." *Code v. Montgomery*, 799 F.2d 1481, 1484 (11th Cir. 1986) (quoting *United States v. Moore,* 554 F.2d 1086, 1093 (D.C. Cir. 1976)).

Here, the Court finds that Lopez's decision, strategic or otherwise, not to investigate Lloyd was wholly unreasonable. Lopez knew how important Lloyd's testimony was.  He knew that if it was favorable to Dasinger's case it could assist in exonerating her on a charge for which she faced a mandatory life sentence. He knew that Dasinger's only real defense was to successfully suppress the evidence she contends was illegally obtained. Under these circumstances, no reasonable counsel would have relied on the unverified, inaccurate hunch that Lloyd was cooperating with the Government to elect not to attempt to locate Lloyd and not to even consider him as a witness. *Rogers*, 13 F.3d at 386; *see also Gomez*, 462 F.2d 596, 597 (finding that counsel was ineffective for failing to make any effort to investigate alibi witnesses identified by the defendant who was facing a mandatory life sentence if convicted).

### b.    Period After the Court Issued its Suppression Order

After the Court issued its Order denying the motion to suppress, it became abundantly clear that Lloyd's testimony was critical to the suppression issue. (Doc. 59) The Court did not have to resolve the factual dispute arising from the law officers' and hotel manager's testimony — the dispute on which Lopez's entire suppression

strategy rested — because the undisputed evidence of Lloyd's consent to the search

ended the inquiry (Doc. 59 at 8–10) (footnotes omitted):

> Here, there is no doubt that Lloyd was authorized to consent to a search of Room 258. The room was rented in his name, he paid for it, and he could have entered and used the room if he so chose. Consequently, his consent to search Room 258 was valid pursuant to *Matlock*[6]. The troopers were legally permitted to enter and search Room 258 unless either of the defendants, as the co-tenants occupying the room, objected to any such search.
>
> Defendants were not present when Lloyd consented to the search of Room 258, nor did he accompany Troopers Hartzig and Rios when they went to search the room. Defendants therefore could not have objected to the search in Lloyd's presence. The troopers' account of events suggests that they knocked on the door and Dasinger invited them into the room. Dasinger's account drawn from the inference of the manager's testimony suggests that the troopers "barged in" after [the hotel owner] swiped his key to grant them entry into the room. In either case, their entry would have been legal, as Lloyd had authorized the search of the room.
>
> More importantly, there is no evidence to controvert the troopers' testimony that when they first encountered Defendants, Trooper Hartzig informed them that Lloyd had consented to a search of the room. The dispute concerning whether the hotel had proposed to refund Lloyd's deposit to the room as Trooper Hartzig advised Defendants is of no moment because it is undisputed that Lloyd had consented to the search of the room. Learning of this, Defendants did not offer any evidence establishing that either of them orally or physically objected to the troopers' presence in the room. Based on the Eleventh Circuit's narrow reading of the *Randolph*[7] exception, Lloyd's consent to a search of the room could be invalidated only by the affirmative objection of one of both of the Defendants. Because there is no

---

[6] *United States v. Matlock*, 415 U.S. 164 (1974).

[7] *Georgia v. Randolph*, 547 U.S. 103 (2006).

evidence that the Defendants lodged any such objection, the Court finds that Lloyd's consent was valid, and the troopers' warrantless entry into Room 258, however accomplished, was not a violation of Defendants' Fourth Amendment rights.

Though Lopez had failed to investigate Lloyd as a witness up to this point, he still had an opportunity to cure his error, because the suppression issue could have been resurrected. After her suppression motion was denied, Dasinger persisted in her attempts to get into contact with Lloyd and also tried to get Lloyd in touch with Lopez. (Civ. Doc. 22 at 41:9–18) Dasinger's father went to Lloyd's home to try to facilitate communication between Lloyd and Lopez before the trial. (*Id.* at 35:7– 36:5) However, Lopez continued to overlook Lloyd's potential as an important witness even after the Court entered its Order. (*Id.* at 78:22–79:7)

In light of the Government's strong evidence of guilt and the mandatory life sentence that Dasinger faced upon conviction, a renewal of the suppression issue would appear to have been Dasinger's best chance at relief outside of a plea deal; thus, the Court finds that, under these circumstances, no reasonable counsel would have continued to forgo any investigation into Lloyd at this time. *Rogers*, 13 F.3d at 386. The Court acknowledges that the period between the entry of the suppression Order and Dasinger's trial was brief — 11 days to be exact. The Court further acknowledges that counsel did make some attempt to locate Lloyd during this time and also requested that the Court continue the trial so that he could have more time to find Lloyd, which request was denied. However, counsel did not even begin to search for

Lloyd until roughly five days before trial, (Doc. 65), and when he did so, his search was wholly inadequate in light of the circumstances.

Lopez testified that, approximately five days before trial, he spoke to an individual by telephone who represented himself to be Lloyd and who advised that he never gave consent to law enforcement to search the hotel room Dasinger occupied. (Civ. Doc. 22 at 49:12–20) After this conversation, Lopez believed Lloyd to be an important witness to Dasinger's case and wanted to speak with him further. (*Id.* at 69:13–23, 76:6–16) At this time Lopez, now faced with direct knowledge that his hunch was incorrect, finally began a search for Lloyd. (*Id.* at 69:17–25) However, as previously mentioned, the steps that Lopez took to locate Lloyd were entirely insufficient given the import of Lloyd's purported testimony to the suppression issue.

Lopez's only actions pertaining to this issue were as follows: (i) Lopez called Lloyd once[8], (ii) Lopez had an investigator call Lloyd numerous times, and (iii) Lopez raised the issue with the Court by filing a motion to continue and for rehearing on the motion to suppress, which the Court denied. (*Id.* at 49:21–53:8) The Court's denial of the motion did not end the issue, because the Court specifically stated that if Lopez could produce Lloyd by the first day of trial, it would hear Lloyd's testimony. (Doc. 66) At this point, Lopez had three days left to procure Lloyd.

---

[8] Though Lopez testified that he called Lloyd approximately ten to fifteen times after their initial conversation, the CJA records reflect that Lopez only billed .1 hours for "Left telephonic message for possible defense witness James Lloyd."

If all of Lopez's testimony about his actions is credited, Lopez did nothing other than attempt to call and have his investigator attempt to call Lloyd during these three crucial days. Lopez testified that Dasinger told him she did not know how to contact Lloyd, and Dasinger testified, conflictingly, that she told him she did know how to contact Lloyd. The Court credits Dasinger's testimony on this point, especially in light of the testimony from both Dasinger's father and Lloyd that they were in contact and had met in person at Lloyd's residence to speak about the case.

Lopez did not ask Dasinger how to find Lloyd, and he did not ask Dasinger's father, who had been to Lloyd's home and knew where he lived, how to find Lloyd. And setting aside the fact that Dasinger's father knew where Lloyd lived because he had been to his home, it does not appear that Lloyd would have been otherwise difficult to locate — he had been residing in the same place for seven years and had family members living "up and down" the street from him.[9] Lloyd also testified credibly that he made consistent efforts to contact Lopez when he unsuccessfully called Lopez's firm from various phones on several occasions and left at least one message. Lloyd also declared under penalty of perjury that he had been available and willing to testify on Dasinger's behalf, which he did do at the October 9, 2018 hearing. Thus,

---

[9] Lloyd testified that, at the time of Dasinger's trial, he lived at 38849 Chase Street in Dade City, Florida. (Civ. Doc. 22 at 21) Judicially noticed records from Lloyd's state criminal case, arising from his arrest at the hotel on October 8, 2013, contain a police report that identifies Lloyd's address as 38849 Chase Street, Dade City, Florida, 33523. Fed. R. Evid. 201. The clerk docketed the police report on October 9, 2013 on the state court's public website. *See State v. Lloyd*, No. 13-CF-1885 (Fla. 5th Jud. Cir.), *available at* https://www.civitekflorida.com /ocrs/app/caseinformation.xhtml?query=O_d1L_vvMfxQ6ztIadk2bQsiCDjQin6865HLT WUA3rg&from=partyCaseSummary.

despite Lopez's claimed difficulty reaching him by phone, the evidence supports that Lopez would have easily located Lloyd had he or his investigator done anything more than unsuccessfully call the same phone numbers. *See Code,* 799 F.2d at 1484 (holding that the failure of counsel to investigate potential alibi witnesses when defendant relied on an alibi defense was ineffective assistance of counsel); *Nealy,* 764 F.2d at 1173 (holding that when a case came down to a "swearing match," trial counsel who did no more to investigate potential alibi witness than call and leave messages for her had not given effective assistance); *Miller v. Singletary*, 958 F. Supp. 572, 577 (M.D. Fla. 1997) (holding that counsel's failure to make further attempts to locate a key witness was unreasonable when counsel unsuccessfully attempted to serve the witness with a subpoena and made no further efforts).

The Court tempers its consideration of the reasonableness of Lopez's efforts to contact Lloyd during this limited time with the understanding that he was simultaneously focused on securing and counseling Dasinger on the amended plea deal and preparing for trial. The Court acknowledges that due to these other pressing concerns, finding Lloyd would not reasonably have been Lopez's *sole* focus in the week leading up to trial. *See Rogers*, 13 F.3d at 387 (explaining that the reasonableness standard "reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources."). However, even considering these additional circumstances, the Court finds that Lopez's limited efforts during this crucial time to locate a lynchpin witness — whose testimony counsel knew was instrumental to the suppression issue and whose testimony the Court had expressly stated it would hear

— were unreasonable and constitute deficient performance. This is especially so where counsel had the benefit of a private investigator who could have been directed to undertake this crucial task.

### 2.    Prejudice

Having found that Lopez was deficient in his failure to investigate and locate Lloyd, the Court further finds that Dasinger was prejudiced by counsel's errors. As stated *supra*, *Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697. To establish prejudice, Dasinger must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Further, "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). S*ee also Zakrzewski v McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006).

Had Lopez located Lloyd, the record supports that Lloyd's testimony would have been favorable to Dasinger. Lloyd testified credibly at the October 9, 2018 evidentiary hearing that he did ***not*** consent to law enforcement's search of the hotel room in which Dasinger resided. (Civ. Doc. 22 at 13:16–25; 24:17–19) Based on this testimony and based upon the Court's rationale in its suppression order, (Doc. 59), the

Court finds a reasonable probability that had Lloyd been located and brought forward to testify at the suppression hearing, the Court would have ruled in favor of Dasinger. Likewise, had Lloyd been brought forward to testify on the first day of trial, the Court would have reheard the suppression issue and almost assuredly altered its ruling. *See Code*, 799 F.2d at 1484 (finding prejudice when counsel's failure to secure an alibi witness effectively deprived defendant of any defense and undermined confidence in trial outcome); *Miller*, 958 F. Supp. at 578 ("The failure of Petitioner's counsel to make reasonable efforts to find a witness that could have been critical to his defense is sufficient to undermine confidence in the outcome of Petitioner's case.").

Specifically, Lloyd's testimony regarding his consent would be contested only by that of Trooper Hartzig, whose credibility was called into question in other respects at the hearing and conflicted with the testimony of the hotel manager. Hartzig's testimony on this issue was not bolstered by that of the other officer at the scene, Trooper Rios, who did not testify regarding Lloyd's consent. Though the Court harbored some concerns about the inconsistency of the testimony at the hearing, the Court did not have to resolve the discrepancies between the Troopers' version of events and the hotel manager's because Trooper Hartzig's testimony about Lloyd's consent was uncontroverted.

Had the Court chosen to credit Lloyd's version of events in this swearing match, the unresolved dispute about whether law enforcement "barged" into Dasinger's room or whether Dasinger consented to their entry would be highly relevant, and the Court cannot say with any confidence it would have resolved those issues in favor of the

Government. In fact, had Lloyd presented additional testimony that directly conflicted with that of the Troopers, their credibility would have been further undermined, such that the Court would have found the hotel manager's testimony to be more credible than the Troopers on the manner of entry into Dasinger's room. The hotel manager testified that he swiped his key to open to the door to the hotel room where Dasinger and Patterson stayed. (Doc. 120 at 13–23) Even though the hotel owner acknowledged that he was not present when the Troopers entered the room, the Court would have drawn a reasonable inference that the Troopers did not knock on the unlocked door and ask Dasinger for permission to enter and instead opened the unlocked door and entered without permission.

Even if Dasinger consented to the troopers' entry into the hotel room, Dasinger did not voluntarily consent. At the suppression hearing, Trooper Rios testified that Dasinger permitted him and Trooper Hartzig to enter the hotel room after they advised Dasinger that Lloyd had consented to a search (Doc. 120 at 71): "Well, we asked to come in and told them we had permission from Mr. Lloyd to search. She said, no problem, she said, come on in." Also, Trooper Hartzig testified that Dasinger permitted them to enter the hotel room after they advised Dasinger that Lloyd had consented to a search of the room. (Doc. 120 at 18) Trooper Hartzig further testified that he advised Dasinger that the hotel manager had refunded Lloyd for the cost of renting the room. (Doc. 120 at 27–29)

The record demonstrates that both statements were false. Lloyd credibly testified that he did not give the troopers consent to search the hotel room. (Civ. Doc.

22 at 13:16–25; 24:17–19) Also, records from the hotel showed that the hotel manager did not give Lloyd a refund for the room that Dasinger and Patterson occupied. (Doc. 120 at 107–09, 116)  Because the troopers falsely told Dasinger that Lloyd had already consented to a search of the hotel room and falsely told her that the hotel had refunded Lloyd the cost of the room, Dasinger would have reasonably believed that she no longer had a right to lawfully remain in the room and no longer had the right to object to the troopers' entry. Consequently, Dasinger did not voluntarily consent to the search. *Spivey*, 861 F.3d at 1213 ("Because we require 'that the consent was not a function of acquiescence to a claim of lawful authority,' deception invalidates consent when police claim authority they lack.") (citation omitted). *See, e.g.*, *Bumper v. North Carolina*, 391 U.S. 543, 549–50 (1968) ("A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. . . . When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion — albeit colorably lawful coercion. Where there is coercion there cannot be consent."); *United States v. Saafir*, 754 F.3d 262, 266 (4th Cir. 2012) ("A search or seizure is unreasonable and therefore unconstitutional if it is premised on a law enforcement officer's misstatement of his or her authority").[10]

---

[10] *See also* Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment §8.2(a) (footnotes omitted and emphasis added):

> The "claim of lawful authority" referred to in *Bumper* need not involve mention of a search warrant. It is enough, for example, that the police incorrectly assert that they have a right to make a warrantless search under the then existing circumstances, or

For purposes of suppression, the Government bore the burden of proving by preponderance of the evidence that Lloyd consented to the search and the consent was voluntary. *United States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004). The Court finds that Lloyd's testimony at the October 9, 2018 hearing was more credible than that of Trooper Hartzig at the suppression hearing on the issue of consent. The Government would have failed to carry its burden to show that Lloyd voluntarily consented to the search and, absent this consent, the motion to suppress would have succeeded.

Because the motion to suppress would have succeeded, all evidence derived from the illegal search would have been suppressed. *Segura v. United States*, 468 U.S. 796, 804 (1984) ("Under this Court's holdings, the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'") (citations omitted).

Consequently, the two digital scales and small plastic bags under the mattress in the hotel room, the set of car keys that belonged to the Toyota parked outside the hotel room, and the methamphetamine, marijuana, cash, and the firearm in the trunk

---

circumstances they could cause to occur; that they claim that absent such consent they will detain defendant while a non-search alternative is used to acquire the information sought; that they falsely claim that failure to consent would be a basis for imposition of some official penalty; **or that the police have misrepresented the existence of certain facts (*e.g.*, valid consent by a co-occupant) which, if they actually existed, would allow the police to make a warrantless search**.

of the Toyota would have been suppressed as primary and derivative evidence obtained as a direct result of the unlawful, warrantless search. (Doc. 121 at 139–51, 180–81, 187–90)

During the interrogation of Dasinger, the DEA agent confronted Dasinger with fruits of the unlawful search of the hotel room (Doc. 121 at 203–05):

| | |
|---|---|
| [Prosecutor:] | Did you ask the Defendant about the methamphetamine that was seized on October 8th of 2013? |
| [Agent:] | I did. |
| [Prosecutor:] | What did she tell you about that methamphetamine? |
| [Agent:] | She told me that although all twelve ounces were found in the same bag, only four of the ounces belonged to her and the other eight ounces belonged to her boyfriend and co-defendant, Jefferson Patterson. |
| [Prosecutor:] | Did she tell you who put the methamphetamine in the backpack? |
| [Agent:] | She did. She stated that when she went to place her four ounces in there that the gun and the other eight ounces were already in the backpack by the time she put hers in there. |
| [Prosecutor:] | Did the Defendant tell you where she got her four ounces of methamphetamine? |
| [Agent:] | She did. |
| [Prosecutor:] | What did she tell you in that regard? |

[Agent:]          She identified her source of supply that she uses up in the Brooksville area.

[Prosecutor:]     Did the Defendant tell you the value of the methamphetamine in regard to her purchase of it?

[Agent:]          She did. She stated that she pays $1,200 per ounce and she actually sold her sources of supply approximately $4,800 [because] that particular meth had been fronted to her or provided on consignment.

[Prosecutor:]     Just to clarify, "fronted" means what?

[Agent:]          Provided, given before payment. They turn it over and then after the person sells it, they bring back the money.

. . .

[Prosecutor:]     Did you ask the Defendant about the firearm that was found?

[Agent:]          I did.

[Prosecutor:]     What did she tell you about that?

[Agent:]          She stated that the gun belonged to, again, her boyfriend and co-defendant, James Patterson. She advised that he has carried it in the bag before, but he doesn't always have it with him.

[Prosecutor:]     Did you ask her if her fingerprints might be on the gun?

[Agent:]          I did. I had asked if her fingerprints would be on it. She said she wasn't sure. She stated she might have touched it a couple weeks prior, but she didn't think her fingerprints would still be on it.

. . .

|  |  |
|---|---|
| [Prosecutor:] | Did you ask her about the car? |
| [Agent:] | I did. |
| [Prosecutor:] | Specifically, the Toyota Avalon that was the subject of the investigation? |
| [Agent:] | Yes, sir. |
| [Prosecutor:] | What did she tell you about that? |
| [Agent:] | She stated that she had borrowed it from a friend, but actually it was her friend's father who owned the vehicle. The father had no knowledge of them using the car. |

Even though the interrogation occurred after the troopers transported Dasinger from the hotel to the parking lot of the county jail and after Dasinger waived her constitutional rights, the agent obtained Dasinger's incriminating statements by confronting her with the fruit of the unlawful search. Consequently, her incriminating statements are also fruit of the unlawful search. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion."); *United States v. Timmann*, 741 F.3d 1170, 1182 (11th Cir. 2013) ("Under the so-called 'fruit of the poisonous tree' doctrine, admissions or confessions that the police induce by confronting a suspect with evidence obtained through an illegal

search or seizure must be suppressed.") (citing *Fahy v. State of Conn.*, 375 U.S. 85, 91 (1963)).[11]

However, the record demonstrates that the prosecutor did not use the fruit of the unlawful search to obtain Patterson's testimony. "The [U.S. Supreme Court] has [ ] held that live-witness testimony may be sufficiently attenuated from the primary violation such that suppression of that testimony is not warranted, based on a number of factors." *United States v. Powner*, 481 F. App'x 529, 530 (11th Cir. 2012) (citing *United States v. Ceccolini*, 435 U.S. 268, 278–79 (1978)). "These factors include whether the testimony was coerced or induced; whether the tainted evidence itself was used to obtain that testimony; the amount of time that elapsed since the illegal search and the testimony; and whether the testimony can be logically traced back to the tainted evidence." *Powner*, 481 F. App'x at 530 (citing *Ceccolini*, 435 U.S. at 279–80).

The indictment jointly charged Dasinger and Patterson with conspiring to possess with intent to distribute fifty grams or more of methamphetamine, possession

---

[11] *See also* Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment §11.4(c) (footnotes omitted), which explains:

> Although the Supreme Court has never confronted, except obliquely, a situation in which it was seriously contended that a confession was the fruit of a prior illegal search, in most such cases there is little doubt as to what the result should be. In the typical case where the defendant was present when incriminating evidence was found in an illegal search or was confronted by the police with incriminating evidence they had illegally seized earlier, it is apparent that there has been an "exploitation of that illegality" when the police subsequently question the defendant about that evidence or the crime to which it relates. This is because "the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak."

with intent to distribute fifty grams or more of methamphetamine, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a convicted felon. (Doc. 1) Patterson did not immediately plead guilty and adopted Dasinger's motion to suppress. (Doc. 42) The Government filed an information notifying Patterson of the Government's intent to seek a mandatory minimum sentence of twenty years because Patterson had one prior drug conviction. (Doc. 34) 21 U.S.C. §§ 841(b)(1)(A) and 851(a) (2013).

Four days before trial, Patterson pleaded guilty to the methamphetamine conspiracy and agreed to cooperate with the Government. (Docs. 61, 63, and 64) The Government agreed to dismiss the possession of a firearm in furtherance of a drug trafficking crime charge, which carried a consecutive five-year mandatory minimum prison sentence, and the other two charges. (Doc. 61 at 2) The Government further agreed to not oppose a sentence at the low end of the sentencing guideline range and agreed to consider whether any substantial assistance justified filing a motion for a reduction in his sentence. (Doc. 61 at 4–6)

Patterson testified on behalf of the Government at Dasinger's trial (Doc. 121 at 112–18), the Government moved under Section 5K1.1, United States Sentencing Guidelines, for a reduction of Patterson's sentence based on substantial assistance, after the jury found Dasinger guilty (Doc. 92), and the Court granted the Government's motion (Doc. 94) and sentenced Patterson to fifteen years and eight months in prison. (Doc. 97) The Government's Section 5K1.1 motion permitted the trial court to sentence Patterson below the statutorily required twenty-year sentence.

18 U.S.C. § 3553(e). If Patterson had proceeded to trial, he faced at least twenty years and up to life in prison for both the methamphetamine conspiracy and methamphetamine possession charges, a consecutive mandatory five years for the possession of a firearm in furtherance of a drug trafficking crime charge, and an additional ten years for the possession of a firearm by a convicted felon charge. 21 U.S.C. § 841(b)(1)(A) (2013); 18 U.S.C. § 924(a)(2), (c)(1)(A) (2013).

At trial, on cross-examination, Patterson agreed that he received significant benefits for pleading guilty including the dismissal of the possession of a firearm in furtherance of a drug trafficking crime, which carried the mandatory, consecutive five-year sentence, credit for accepting responsibility, and consideration by the Government of a further reduction in his sentence for substantial assistance. (Doc. 121 at 125– 29)

*Ceccolini*, 435 U.S. at 276–77, explains that, unlike tangible evidence, a witness may testify on his own volition despite that fact that an unlawful search or seizure leads law enforcement to the discovery of the witness:

> Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

. . .

> Another factor which not only is relevant in determining the usefulness of the exclusionary rule in a particular context, but also seems to us to differentiate the testimony of all live witnesses — even putative defendants — from the exclusion of the typical documentary evidence, is that such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby. Rules which disqualify knowledgeable witnesses from testifying at trial are, in the words of Professor McCormick, "serious obstructions to the ascertainment of truth"; accordingly, "[f]or a century the course of legal evolution has been in the direction of sweeping away these obstructions." C. McCormick, Law of Evidence § 71 (1954). Alluding to the enormous cost engendered by such a permanent disability in an analogous context, we have specifically refused to hold that "making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *United States v. Bayer*, 331 U.S. 532, 541 (1947). For many of these same reasons, the Court has also held admissible at trial testimony of a witness whose identity was disclosed by the defendant's statement given after inadequate *Miranda* warnings. *Michigan v. Tucker*, 417 U.S. 433, 450–451 (1974).

Even though the Government obtained the indictment with the unlawfully seized evidence, and the charges in the indictment caused Patterson to plead guilty, Patterson's testimony at trial is not a fruit of the unlawful search. *Powner*, 481 F. App'x 529, 531 ("Powner does not contest the validity of the indictments themselves. Indeed, *Calandra*'s holding that unlawfully seized evidence may be submitted to a grand jury to obtain an indictment would bar such an argument. And given the validity of the indictments, we cannot accept Powner's contention that the statements and testimony

extracted by using those otherwise valid indictments are somehow fundamentally tainted.") (citing *United States v. Calandra*, 414 U.S. 338, 354 (1974)).

Because the record demonstrates that the Government did not exploit the unlawfully obtained evidence to obtain Patterson's testimony, that Patterson instead agreed to cooperate because of the indictment and because he sought to obtain a reduction in his sentence, and that significant time elapsed between the unlawful search and Patterson's testimony at trial, Patterson's testimony was not a fruit of the unlawful search.

However, Dasinger demonstrates a reasonable probability that the jury's verdict would change without the fruits of the unlawful search. *Kimmelman*, 477 U.S. at 375. The Government's case against Dasinger critically weakens without the methamphetamine, the firearm, the cash, the digital scales, the small plastic bags, and Dasinger's confession. (Doc. 121 at 139–51, 180–81, 187–90) Patterson testified that he and Dasinger possessed over fifteen grams of methamphetamine; without the substance seized from the trunk of the Toyota, the Government could not prove beyond a reasonable doubt that the substance was methamphetamine and weighed over fifteen grams. Patterson testified that he and Dasinger together sold methamphetamine; without the scales, plastic bags, the methamphetamine, and the firearm, the Government could not corroborate Patterson's testimony concerning the conspiracy. Patterson testified that Dasinger observed and knew about the firearm in the backpack; without Dasinger's admission during her confession that she knew

about the firearm, the Government could not prove beyond a reasonable doubt that Dasinger knew about the firearm.

Patterson, an eight-time convicted felon who faced at least twenty years in prison after his guilty plea, admitted that he agreed to testify because he sought to mitigate his sentence. (Doc. 121 at 121–30) A reasonable and conscientious juror would find the Government's case based only on Patterson's self-serving testimony against his ex-girlfriend, uncorroborated by the physical evidence and Dasinger's confession, as highly unpersuasive. *Strickland*, 466 U.S. at 695–96 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

Consequently, Dasinger demonstrates a reasonable probability that the exclusion of the physical evidence and Dasinger's confession would eviscerate the Government's case. *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005) ("Parrish's claim of prejudice is further supported by the notable weaknesses in the prosecution's case . . . . The only evidence linking Parrish to the crime was the eyewitness testimony of Roland Higgs. We have repeatedly expressed our 'grave reservations concerning the reliability of eyewitness testimony,' and Higgs's identification of Parrish in this case was particularly shaky.") (citations omitted); *Gersten v. Senkowski*, 426 F.3d 588, 613–14 (2d Cir. 2005) ("[W]here the record evidence in support of a guilty verdict is thin, as it is here, there is more likely to be prejudice. This is even more true where

counsel's failures go to something as important as the medical evidence in this case — the only objective evidence that a crime occurred and the only evidence directly corroborating any aspect of the victim's story.").

The Government has pointed to no competent record evidence to support a claim that, absent the illegally seized drugs and firearm, the other evidence presented at trial was sufficient to convict Dasinger at trial. Thus, without this critical evidence, there is not only a reasonable probability that the outcome of the trial would have been different, but it is nearly certain that the Government would have either lost at trial or the case would have been dismissed. Thus, the Court finds that Lopez's deficient performance in failing to search with any diligence for Lloyd prejudiced Dasinger.

## IV.   CONCLUSION

Accordingly, the motion to vacate under 28 U.S.C. § 2255, (Civ. Doc. 1), is **GRANTED IN PART and DENIED IN PART**. For Ground One, because Dasinger fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate the merits of the grounds or the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

For Ground Two, Dasinger demonstrates that she is entitled to release. 28 U.S.C. § 2255(b) ("If the court finds that . . . that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence [her] or grant a new trial or correct the

sentence as may appear appropriate."); *United States v. Brown*, 879 F.3d 1231, 1235 (11th Cir. 2018) ("'[F]ederal habeas corpus practice . . . indicates that a court has broad discretion in conditioning a judgment granting habeas relief.' And indeed this Court has recognized 'the broad, flexible power conferred by section 2255.'") (citations omitted).

Accordingly, the Clerk is **DIRECTED** to **VACATE** Dasinger's judgment in *United States v. Dasinger*, No. 8:14-cr-62-MSS-AEP (M.D. Fla.), to **RE-OPEN** the criminal action for further proceedings consistent with this Order, to **DOCKET** a copy of this Order in the criminal action, to **ENTER** a judgment in this civil action in favor of Dasinger on Ground Two and against Dasinger on Ground One, and to **CLOSE** this case.

**DONE AND ORDERED** in Tampa, Florida on September 22, 2023.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE